IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 13, 2002  Session

## STATE OF TENNESSEE v. BARRY F. BRADEN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-B-763    J. Randall Wyatt, Jr., Judge**

_____

**No. M2001-00226-CCA-MR3-CD - Filed July 26, 2002**

_____

Defendant, Barry F. Braden, was convicted by a Davidson County jury of six counts of aggravated robbery, a Class B felony.  He was ordered to serve consecutive ten year sentences for counts one, two, four, five and six, to be served concurrently with a ten-year sentence in count three, for an effective sentence of fifty years.  Defendant appeals his convictions and sentences, presenting the following issues for review: (1) whether the prosecutor's inquiry on cross-examination and comments during closing argument on Defendant's failure to submit fingerprints and his failure to take a polygraph examination constituted reversible error; (2) whether the evidence was sufficient to sustain his convictions; (3) whether the trial court erred by admitting a witness's extraneous statement at trial; (4) whether the trial court erred by ordering consecutive sentences for five of Defendant's six convictions; and (5) whether the trial court erred by failing to sever the offenses for trial.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Michael H. Sneed, Nashville, Tennessee (on appeal) and Nathaniel Koenig, Nashville, Tennessee (at trial) for the appellant, Barry F. Braden.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin Miller, Assistant District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On October 11, 1996, at approximately 6:45 a.m., John Piper, a retiree, was sitting in the backyard of his home located at 563 Croley Drive in Nashville. At the time of the offense, Mr. Piper resided in the home with his wife, Frances Piper, son, Donald Piper, and grandson, Roger Piper, all of whom were home that morning. Suddenly, he felt a person grab his neck from behind and place a gun to his head. From his viewpoint, he identified three assailants, one woman and two men. He testified that all three were African-American. They demanded money and he gave them a five dollar bill in his pocket. They later took his wallet which contained a one dollar bill. The wallet was later recovered that same day, but the money was gone. He was then led into the house at gunpoint and forced to lie face-down on the dining room floor. As he entered the house, he yelled to his wife that they were being robbed. Although they attempted to cover his face with a towel, he pulled it off. As one male assailant held him at gunpoint, the other two assailants began to search the home. They were demanding money and guns. Even though he could not see all of what transpired, Mr. Piper believed that they confronted his wife as she exited their bedroom located on the first floor. Approximately fifteen minutes later, one of the male assailants and the female assailant reentered the room. Earlier, the other male assailant had exited the home to retrieve the car. Then, Mr. Piper heard a car horn blare, and the two remaining assailants ran out the front door. He recalled that the car they escaped in was an older model, large car.

After the assailants left, Mr. Piper entered his wife's bedroom and found her in the closet. He described his wife's mental state as numb and stated that she appeared scared to death. He testified that the assailants took several of his wife's diamond rings and approximately $80.00 from her pocketbook, none of which was recovered. They also took an antique double-barreled shotgun that was a gift from his father-in-law. After the suspects left, he ran next door to Jenny Brummitt's house and called the police. He was unable to call from his home because the assailants had ripped the phone cords from the wall during the robbery. Approximately one month after the robbery, Detective Whitehurst presented Mr. Piper with photographs of possible suspects. He was unable to identify any of the people as the robbers. However, he stated that although the two male assailants had their faces covered, he was able to see their mouths, noses and eyes. He also recalled that one wore a trench coat. He described the woman as short and small framed, but was unable to identify her clothing. Mr. Piper testified that the man who came up grabbed him from behind was Mr. Piper's height or taller. Mr. Piper is five feet ten and a half inches tall. When Defendant stood beside Piper at trial, he testified that Defendant could have been one of the robbers based on his height. Mr. Piper also commented "I know one thing, this thing cost me my wife." Mrs. Piper did not testify at the trial. At the time of trial, she resided in a nursing home diagnosed with Alzheimer's disease.

Donald Piper testified that on October 11, 1996, he was in his bedroom asleep when he was awakened by a strange man pointing a gun in his face. The man demanded money and Donald gave him $80.00. He testified that he was unable to see the man's face because he was wearing a hood.

The man then ordered him into the closet. A few minutes later, a woman came into the room and peered into the closet. He described both robbers as young, African-Americans. In his opinion, the man was approximately twenty years old. When presented with photographs of potential suspects, he stated that the woman in the photograph "might have been" the woman he saw at the house, but that he was unsure. He was unable to pick out the male assailant.

Roger Piper also testified that he was robbed at gunpoint while he was lying in his upstairs bedroom. He also described the man as African-American and stated that he was wearing a large overcoat with a hood that covered his face. The man demanded money and guns. Items stolen during the robbery included his wallet that contained one ten dollar bill, a checkbook, beeper, and a desk telephone. As he was leaving, the man threatened to shoot Roger if he came downstairs. Although he did not attempt to go downstairs, he looked out a window and saw a lady carrying a shotgun run out their front door and jump into a car that was waiting in front of the house. He described her as an African-American, very thin, with wide eyes and big lips. He described the car as a two-toned, four door large car with a dark blue bottom and light blue top. He watched as the woman threw the shotgun into the car's trunk. He also saw a third person driving the car. He stated that when presented with photographs a month after the robbery, he positively identified the woman, but not the males.

Jenny Brummit, who lived next door to the Pipers, testified that on the morning of October 11, 1996, she noticed strange activity at the Piper home. She recalled hearing the sound of a car horn blowing, and her dog barking frantically. When she peered outside, she saw a two-toned blue mid-eighties model large car, such as an Oldsmobile or Cadillac, parked in front of the Piper's driveway. She noticed a man exit the car and cover the car's license plate with a towel. She described the man as a large African-American man, between five feet ten inches and six feet tall. She watched as a small-framed woman came running out of the house with a shotgun slung over her arm. She saw a third person in the driver's seat. Thinking that her neighbors were dead, she closed her front door. Then, Mr. Piper came running over and asked her to call the police.

Officer George Espinoza, the first officer on the scene, testified that on October 11, 1996, at approximately 6:50 a.m., he responded to an armed robbery call at 563 Croley Drive. Within three to four minutes, he arrived at the scene and spoke with the victims and took their statements and the description of the suspect's car. He also summoned the Identification Division of the police department to search for hand prints or fingerprints. Officer William Merrill, an employee in the Identification Investigation Division (I.D.), testified that he investigated the crime scene at 563 Croley Drive, and arrived at approximately 7:33 a.m. He explained that the I.D. division is a specialized unit that searches for any type of physical evidence at a crime scene, including fingerprints, body fluids, hairs, fibers, footprints or tire prints. He further explained that fingerprints lifted from a crime scene are called latent prints, and that these type of prints are not visible with the naked eye. Latent prints are usually detected by dusting a surface with a powder which reveals the print. Then, tape is placed over the print, and the print is lifted upon the tape and transferred to a lift card for identification. Upon Officer Espinoza's request, he dusted certain areas for latent prints including a cable tv box, several door frames, hallway doors leading into certain bedrooms and closet

doors within those bedrooms. One latent print was lifted from the hallway door leading into Donald Piper's bedroom, and three were lifted from the closet door in Mrs. Piper's bedroom. The latent prints were then placed on lift cards, placed in a latent print envelope, and then submitted to the Latent Print Examiner for identification purposes.

Danny Morris testified that he is employed by the Metro Nashville Police Department as a Civilian Identification Supervisor. His job entails comparing latent impressions with known inked prints, and testifying to the results. He has received extensive training in latent print identification and has been employed as a fingerprint expert for eleven years. After comparing the prints lifted from the Piper crime scene to the fingerprints of potential suspects, he was able to positively identify one print lifted from the hallway door leading into a bedroom as that belonging to Kent Braden. The other latent prints were not matched to any other individual. He testified that no two persons in the world have the same fingerprints.

Demetrius Martin testified that on the morning of October 11, 1996, she, Kent Braden, and Barry Braden were "hanging out." She stated that all three were friends and co-workers. They were riding around in Barry Braden's car looking for someone to rob when they spotted an elderly gentleman sitting in his backyard. Barry Braden, who was driving the car, parked the car one house away. She described the car as an eighties model four door blue Oldsmobile. All three then exited the car and approached the man from behind. She testified that Barry and Kent Braden were both armed with guns, a 9 millimeter and a .32. pistol, respectively. Kent Braden then grabbed the man around the neck and demanded money. The man replied that he only had a five dollar bill, which they took. They led the man into his home, and forced him to lie down on the floor. Barry Braden held a gun to the man's head, while Kent Braden and Ms. Martin searched the home for money and guns. They entered a bedroom where they confronted a woman who appeared to be the man's wife. After taking her money, they forced her into a closet and took a shotgun found in that closet. They then entered another bedroom, held another younger man at gunpoint, and took his money. They then forced him into a closet. They proceeded upstairs where they encountered another man who gave them money, a checkbook, a pager, and a telephone. During each encounter Kent Braden brandished a gun, and held it to each person's head. After approximately fifteen minutes, they ran out of the residence and drove away. They put some of the stolen property into the car's trunk and split the money. To the best of her knowledge, Kent kept the pager and Barry took the rest of the stolen goods to his home. The robbery occurred at approximately 5:00 or 6:00 a.m.

Ms. Martin testified that on the night of October 16, 1996, the three friends also robbed a young couple. On this night they were riding around in Barry Braden's car, the same car used in the first robbery, looking for someone to rob. They noticed a young couple and began to follow their car. When the couple pulled into an apartment complex, Ms. Martin and Kent Braden got out of the car and approached the couple. Barry Braden, the driver, remained in the car. Kent Braden was carrying a .32 pistol, and Ms. Martin was armed with a 9 millimeter. She testified that both guns were the same weapons used in the Piper robbery five days earlier. Holding the couple at gunpoint, Kent then demanded money and the couple's valuables. The man handed Kent his car keys, a watch and some money, and the woman gave Ms. Martin her watch. Kent then instructed the couple to run

down the hill in the opposite direction. Kent threw the couple's car keys into a bush, and the pair returned to the car and split the money. She testified that Barry Braden was aware of the robbery. Ms. Martin kept the watch stolen from the victim.

Three weeks after the second robbery, Ms. Martin was stopped by police while riding around with friends. It was later discovered that the car they were in was registered to Barry Braden. She testified that this car was the same one used in both robberies. However, neither Barry nor Kent Braden was with her on that night. She testified that several weeks earlier, Barry had bought a new car and asked her to take over payments on the Oldsmobile. At the time of the arrest, she had been driving the car for a couple of weeks, but had not made any payments. Ms. Martin was arrested after police discovered two guns in the car's back seat. Police also discovered a checkbook in the glove compartment, which did not belong to anyone in the car. She testified that the two guns were the same weapons used in both robberies. She was arrested and charged with possession of weapons and contributing to the delinquency of a minor, after officers discovered that two passengers in the car were minors. She later pled guilty and was placed on probation. When questioned on the night of the arrest, Ms. Martin told officers that she did not know anything about the Piper robbery. On February 4, 1997, Ms. Martin was arrested for the two robberies which occurred on October 11 and 16, 1996. While in custody, she confessed to committing both robberies, and identified Kent and Barry Braden as her accomplices in those robberies. She also admitted that she retained the watch stolen from the young woman during the second robbery. With her consent, the watch was retrieved from her apartment.

Ms. Martin further testified that in mid-October she began working at Defender's Services, a cleaning agency, where Kent and Barry Braden were employed. Normally, she worked the second shift, from 3:00-11:00 p.m., and both co-defendants worked the third shift, from 11:00-7:00 a.m. She testified that per the company's policy, workers were required to sign in and out on a piece of paper whenever they left their job posts. However, she stated that on several occasions, she was able to leave before her shift ended, all the while marking down that she left at her normal time. She testified that this was a common practice. She further stated that in October 1996, she saw Barry Braden practically every night and that they would usually meet at approximately 2:00 or 3:00 a.m., approximately three or four times a week. She assumed that although he was scheduled to work, he probably just signed out. However, on cross-examination, she admitted that employees had to pass a security guard station when leaving Defender's Services. She further admitted that in a written statement given to Detective Whitehurst on February 4, 1997, she stated that she and Kent Braden had robbed a male and female in an apartment complex. She had not mentioned Barry Braden. She further denied purchasing the Oldsmobile from Barry Braden, or paying him any money for the car.

Ms. Martin testified that she has not had any conflict with either co-defendant. She was incarcerated at the time of Defendant's trial. Ms. Martin also had charges pending in other criminal proceedings wherein she was testifying as a State's witness. She testified that she was not promised anything in exchange for her testimony.

Jay Kavanaugh testified that on October 16, 1996, he and his wife, the former Dawn Ferrell, were robbed while returning home from the Hard Rock Café. He stated that the robbery occurred a little after midnight. At the time of the offense, he was living in a condominium at 2110 Portland Avenue, in Nashville. He testified that they paused in the parking lot when they noticed a car that was vandalized, which caught their attention because it was unusual in their neighborhood. While they were looking at the car, a man and woman approached them. The man, yielding a large black revolver, pointed the gun directly at Mr. Kavanaugh and demanded his money and other valuables. He testified that the robbery occurred while they were standing under a street light that illuminated the whole parking lot. He further testified that he was able to get a good look at the man because the man was only an arm's length away. Mr. Kavanaugh then identified Defendant, in court, as the person who robbed them. Both suspects were identified as African-Americans. He described the man as thin, and approximately six feet one or two inches tall. He testified that items stolen included his Timex watch and his wallet which contained credit cards, a driver's license, and approximately $100.00. The woman assailant also took a watch from his wife. The man then frisked him and retrieved his keys from his front pants pocket, and threw them into the bushes. The male assailant then instructed them to turn and run in the opposite direction. They ran and hid in the bushes. When they saw the suspects leave, they immediately called the police and gave a description of the stolen items. On February 7, 1997, Detective Whitehurst called them and they went to the police station to retrieve his wife's watch that had been recovered. While there, Detective Whitehurst showed them a series of six photographs in a photographic lineup. Mr. Kavanaugh positively identified Defendant in photo No. 5 as the man who robbed him. On the morning of the trial, Mr. Kavanaugh was also presented with a photograph of Kent Braden, Barry Braden's cousin. He stated that he was positive that Kent Braden was not the robber. He also testified that when he entered the courthouse for trial that day, he saw Defendant. Although no one had informed him that Defendant was in fact the defendant in this case, he stated that when he saw him, he and his wife stated, "[t]hat's the guy that robbed us."

Mr. Kavanaugh admitted on cross-examination that during the photographic lineup, he pointed to Defendant and stated "[h]e looks kind of close," and then pointed to the man in photo No. 3 and made the same statement. Specifically, he commented that, "[N]o. 3's eyes were too light. Though if I had to pick one, I would say No. 5 [Defendant], if I had to pick one." He explained that he ruled out the second suspect No. 3, because he had green eyes or considerably lighter eyes. He further admitted that he could not identify the woman. He reemphasized that he was positive that the person he saw outside the courthouse, and in the courtroom on that day, was the person who robbed him.

Dawn Kavanaugh also testified. She corroborated Mr. Kavanaugh's testimony of the events surrounding the robbery. She described the woman who robbed her as shorter than the man and a little older. She also identified Defendant, at the time of trial, as the man who robbed her. When Detective Whitehurst contacted her a couple of months later to come and retrieve her watch, she participated in a photographic lineup of six different women's photos. She stated that she identified one woman who she was fairly certain was the person who robbed her. When presented with a separate photographic lineup of various male suspects, she identified No. 5 as the man who robbed

her. The man in photo No. 5 was Defendant. She was also presented, on the morning of trial, with a photograph of Kent Braden. She testified that she was positive that he was not the person who robbed her. In addition, while standing outside the courtroom, prior to the trial, she saw Defendant, and unaware that he was the defendant, she stated that there was no doubt in her mind that he was the person who robbed her because "I will never forget it." She further testified that she was positive that the watch recovered belonged to her because it had the same scratch in the crystal face.

Mrs. Kavanaugh admitted on cross-examination that on the night they were robbed, she had consumed a few beers. She also admitted that when she identified the man during the photographic lineup she made the following comment, "I'd say it's No. 5 [Defendant], if I had to pick one, but it seems his hair was longer. I would be pretty sure of that. I think."

Officer Freddie E. Garrett testified that on November 9, 1996, he was on patrol in a marked police car in West Nashville. He stated that he stopped a car for speeding and that Ms. Martin was a passenger in the car. The car was a four door, blue 1983 Oldsmobile 98, registered to Barry Braden. Along with Ms. Martin, there was a male driver and two juvenile passengers. During the stop, he noticed what appeared to be metallic objects in the back seat which he later discovered were guns. One gun was a .38 revolver and the other was a semi-automatic 9 millimeter. He also discovered ammunition for the 9 millimeter. He then arrested Ms. Martin and the driver of the vehicle for weapons possession and contributing to the delinquency of a minor. The juveniles were also arrested on a weapons possession charge. While searching for the car's registration in the glove compartment, he discovered a checkbook belonging to a Mr. Piper. After discovering that none of the car's occupants was named Piper, he called the phone number on the checkbook and discovered that it was stolen during a robbery on October 11, 1996. He transferred the property collected to the property room and impounded the car.

Detective Dan Whitehurst was the chief armed robbery investigator assigned to this case. He testified that initially, he did not have any potential suspects in the Piper robbery. Then, in November 1996, he learned from Officer Freddie Garrett that a checkbook from the Piper robbery had been recovered in a blue Oldsmobile 98, registered to Barry Braden. The car's description matched that of the vehicle used during the robbery on October 11. He then submitted the names of the four people arrested by Officer Garrett for a fingerprint analysis and comparison with the latent print lifted from the Piper home. He also took a group of six photographs, which included one of Ms. Martin, to the Piper residence to see if they were able to identify any suspects. After presenting them to each one separately, Roger Piper made a positive identification of Ms. Martin as one of the robbers. He then obtained a warrant for Ms. Martin's arrest for aggravated robbery. He testified that the Pipers were unable to identify any of the men involved from the photographs presented to them.

Prior to Ms. Martin's arrest, on December 4, 1996, Barry Braden called to retrieve his Oldsmobile. Upon Detective Whitehurst's request, Mr. Braden came to the police station that same day to talk about the car. Mr. Braden explained that the car belonged to him, but that he had let someone borrow the car. Mr. Braden admitted that he knew Ms. Martin and the man who was

arrested while driving the car. Detective Whitehurst then informed Defendant that he suspected that the car was involved in an offense. When questioned about his car's whereabouts, on October 11, 1996, Mr. Braden stated that his car was broken down during the first half of October. He further stated that no one had ever borrowed the car before the date Ms. Martin was arrested. Mr. Braden also stated that he did not know how the stolen items got into his car. Barry Braden, who was not under arrest at the time, then left the police station. On February 4, 1997, Detective Whitehurst spoke with Ms. Martin who admitted that she, Kent Braden, and Barry Braden had committed both robberies. Ms. Martin gave further descriptions of the victims and events that transpired in the Piper home. He stated that she exhibited knowledge that only someone involved in the robbery would know. He also confirmed that after individually showing Mr. and Mrs. Kavanaugh a photographic lineup, Ms. Dawn Kavanaugh identified both Ms. Martin and Defendant Barry Braden as the robbers, while Mr. Jay Kavanaugh was only able to identify Defendant Barry Braden. He recorded the results on a photographic identification form. Detective Whitehurst testified that Mrs. Kavanaugh identified Ms. Martin by stating, "[i]t could have been her [Ms. Martin] . . . if her hair had been different. I'm going to say it was her even though her hair was not like that." A few weeks before the trial, he submitted fingerprints of Barry Braden to be compared with the latent prints found in the Piper home. The fingerprint analysis returned negative. Detective Whitehurst also testified that on the morning of trial, he presented the Kavanaughs with a picture of Kent Braden and that both stated, "that's not him."

On cross-examination, Detective Whitehurst admitted that Barry Braden's fingerprints were not found on any property confiscated from the Oldsmobile. He also admitted that when he initially conducted the photographic lineup with the Kavanaughs, he did not include a photograph of Kent Braden, although Ms. Martin implicated him as one of the robbers. He stated that he did not have Kent Braden's photograph at that time. He further admitted that Barry Braden's name was not mentioned in the report he typed of Ms. Martin's interview of the Kavanaugh robbery. The relevant portion of the report was read into the record, which stated "[o]n 2/4/97, during the interview of Ms. Demetrius Martin, she admitted that she and Kent Braden robbed a male and female white who were standing, facing an apartment."

Patricia Braden, Defendant's mother, testified that her son was living with her during October 1996. She stated that in February 1996, she gave her son a down payment for an older model blue car. Then, during the first of October 1996, her son bought another car, an older model white Cadillac with the money he received from selling his blue car. She stated that he sold his blue car at the end of September. During October 1996, Ms. Braden was caring for her father who was ill. She testified that Barry would often help her by babysitting his younger three-year old brother, Marquis Braden. She testified that to her knowledge, her son Barry Braden was there every morning in October when she awakened. She specifically recalled that he was there on Friday, October 11, 1996, because every Friday morning she had to take her father to his chemotherapy treatment at 8:00 a.m. She testified that she would leave their home each morning and leave her younger son in Barry's care. Barry Braden had a key to the home's front door. She stated that some nights before she went to sleep, she would rig the front door so that no one could enter from the outside, even with

a key. She stated that she had met Ms. Martin once, and that Barry used to transport Ms. Martin and another friend to visit someone.

She further testified on cross-examination that her son, Barry, would usually be home on the weekdays before she left at approximately 6:45 a.m. She further testified that Ms. Martin had the car a couple of weeks before November 1, 1996. She remembered that date because it was the day her father died. She also testified that Kent Braden is Barry Braden's first cousin.

Kenneth Pritchard testified that in August 1996, he accompanied Barry Braden when he purchased the blue Oldsmobile. He also stated that during 1996, he used to come home each weekend from college. During one week-end visit during the middle of October, he saw Barry driving a new car, a white Cadillac. He further testified that during the latter part of October, he saw Ms. Martin with the Oldsmobile parked in front of her house, and that Barry later told him that he sold it to her.

Mr. Braden, Sr. testified that he originally went with Barry Braden when he purchased the Oldsmobile. He did not remember Mr. Pritchard being there. He testified that his son later sold the car to Ms. Martin in October 1996. After his son sold his old car, he purchased a white Cadillac. He testified that he and his son worked at Defender Services on Cockrill Bend in Nashville. He stated that at Defender Services there is only one main entrance to the factory, and that to enter the building, you have to pass a gate and a guard shed. The employee must also sign in at the office, and record the date and time of entry. He stated that the employees are not allowed to come and go at will.

Ann Seat testified that she is a manager at Defender's Services, and was assigned to the Spring Bath Fashions Factory. She stated that Barry Braden was a good employee who sometimes worked extra shifts when necessary. A time sheet from October 15, 1996 was entered into evidence without objection. She testified that the time sheet reflected that Barry Braden worked a double shift on October 15, 1996. His shift entailed working from 3:00-11:00 p.m. on October 15, 1996, and then 11:00-7:00 a.m. the next morning. She testified that Barry Braden probably worked the entire shift. She based this statement on records that were introduced into evidence including Mr. Braden's check stub and time sheet for that pay period. She testified that these records were kept in the normal course of business. She also identified a check stub for the pay period which concluded on the week of October 19, 1996. It reflected that Barry Braden worked a total of fifty-six hours, sixteen hours of which included overtime. She stated that she arrives at work at approximately 6:30 a.m., and that it is her responsibility to check on the employees that work third shift. She was sure that she saw Barry Braden when she arrived on October 16, 1996. If not, she would have received a slip of paper from the guard shack informing her that he left early. According to company policy, if an employee leaves early, that employee must stop at the guard shack and write his or her name down and the time that they leave, as well as the time they return. The employee's pay would then reflect any time missed. If any employee's pay is "docked," when that employee picks up his or her check, the employee has to sign a sheet that reflects the amount of time and the pay deducted. On October 16, 1996, she did not receive any notice that Barry Braden had left the plant. She testified

that employees are not allowed to come and go as they please. She also confirmed that there is only one entrance into the plant, and that at the entrance, there is a guard shack and a gate. The plant is also surrounded by a fence and employees must present identification cards to enter the premises. After entering the premises, the employee is required to record their time of arrival and a supervisor later verifies that the employee was present. She stated that based on her time sheet, there was no doubt in her mind that Mr. Braden was at work on the evening of October 15, 1996, and the morning of October 16, 1996. However, on cross-examination, she admitted that there is no supervisor on third shift. She also verified a time sheet submitted from October 11, 1996, showing that Barry Braden worked second shift, from 3:00-11:00 p.m. She also confirmed that Kent Braden and Demetrius Martin worked the same shift that day.

Barry Braden, Jr. testified and denied any involvement in the robberies on October 11 and 16, 1996. He stated that he became acquainted with Ms. Martin in 1996, through a high-school friend, Chris Davis. In February 1996, he used money that his mother had given him as a down payment and purchased a blue '83 Oldsmobile 98. The car had a weekly payment of $50.00. He stated that it remained in his name until it was repossessed in February 1997. The first week of October, he sold the car to Demetrius Martin. Although she was supposed to give him the complete $800.00 down payment for his new car, she only gave him $600.00. Per their agreement, she was also supposed to assume the weekly payment on his blue car. He stated that he bought his new car, a '79 model white Cadillac, on the same day she gave him the down payment. Later, he learned that his former car, the blue Oldsmobile, had been towed. When he went to pick up the car, the tow-lot instructed him that he had to speak with Detective Whitehurst before the car was released. When he arrived at the police station, Detective Whitehurst informed him that they discovered weapons and evidence of a robbery in the car. He denied knowing how the items got there. He then stated that he was aware that Ms. Martin was in his car. When asked to submit a fingerprint sample and also take a lie detector test, he refused and stated, "not without a lawyer." Mr. Braden testified that Detective Whitehurst then stated "well, if you don't want to take it without a lawyer, then there's really nothing else I can do for you or you can do for me." When Mr. Braden left and attempted to retrieve his car, they sent him back to Detective Whitehurst to get a signed release form. Detective Whitehurst refused to sign the release. He stated that by this time, the auto dealership had repossessed the car. His white Cadillac was later repossessed because he was unable to maintain a steady payment history.

He further testified that on October 11, 1996, he was at home at approximately 6:45 a.m. He stated that he had worked the night before on second shift, from 3:00-11:00 p.m. He stated that in October 1996, he babysat his little brother while his mother cared for his grandfather. He also testified that he worked a double shift on October 15, 1996, through the morning of October 16, 1996. He denied leaving the job premises that evening. He stated that although there was no direct supervisor during third shift, another supervisor monitored the entire plant. He further denied telling Detective Whitehurst that his car was broken down during the first half of October or that he let anyone borrow the car. Instead, he reiterated that Ms. Martin had purchased the car from him. Although requested, he was unable to produce any evidence of the Cadillac purchase. He claimed that the proof of purchase was in the Cadillac when it was repossessed. He stated that he was friends

with Ms. Martin and spent time with her and his cousin, Kent Braden. He admitted that he helped Ms. Martin get her job at Defender Services.

## ANALYSIS

I.      Prosecutor's Comments

In his first issue, Defendant argues that the State prosecutor made improper and highly prejudicial statements during trial and closing argument. Specifically, he claims that the State's inquiry on cross-examination and comments on Defendant's initial failure to provide a palm print sample and his refusal to take a polygraph examination constitutes reversible error. We disagree.

During Defendant's direct examination, defense counsel asked Defendant how he discovered his car had been taken to the "tow-in lot." Defendant then launched into a very lengthy, uninterrupted discourse which included the following unsolicited comments: "[Detective Whitehurst said] we'd like to take a fingerprint and a lie detector test. I said, not without a lawyer."

The challenged comments at issue were made during the State's cross-examination of Defendant and also during the State's closing argument. On cross-examination, the following transpired:

Q.      Mr. Braden, you – you did recently submit to having your palms printed, correct?

A.      Yes, sir.

Q.      And you say you did that because you didn't have anything to hide. You never touched anything out at these places that were robbed?

A.      I was never at any of those places that was robbed. You're correct, sir.

Q.      Also, in fact, you knew that the other two – that the State could well get a Court Order for you to – a Court Order to require you to give up you palm prints, correct?

A.      I was told at the time that Mr. Koenig said I have a right to either give my palm print or not give my palm print. I said I do not give anything if it would incriminate me. I was given that choice. And I was saying I would give my palm print, any other pictures, my toe prints, anything.

Q.      Well, back when – on – in December of 1996, when Detective Whitehurst talked to you, you weren't willing to give up any fingerprints at that time?

-11-

A.    No, sir. I didn't have an attorney. I never needed an attorney.

Q.    All right. But you knew you hadn't been anywhere where your prints could be incriminating?

A.    No, sir. But I watched too many tv shows and anything to know the first thing you do is you get a lawyer. You can ask anyone that.

Q.    All right. And you were given an opportunity to take a polygraph test, and you turned that down?

A.    Of course.

Q.    Okay.

A.    It goes along with it.

The prosecutor made the following statements during closing argument:

> And he also says – Mr. Braden says that Detective Whitehurst asked him would he give some fingerprints so that he could be compared with some of the fingerprints, maybe, in these robberies. And he says no. And he's asked if he wants to take a polygraph examination. And he says no. And his explanation for that is, well, I've seen too many police shows. I know that you don't do that without a lawyer. Well, why in the world would it have hurt him to give his fingerprints to be compared on cases that he knew nothing about, he knew he wasn't involved in no robbery, why would it bother him to give up his – his fingerprint? Why would an innocent person say I'm not giving you any fingerprints without a lawyer? Does that make any sense? Wouldn't he want to say, I didn't do anything, take my fingerprints, compare them to any robbery in Davidson County, Tennessee, and I'm going to come up clean because, by gosh, I wasn't there. I didn't do it. No, he says I'm not giving you any fingerprints. And finally, a few weeks ago, under the possibility of court order, he gives up some fingerprints. And they didn't come back to him, but that's besides the point. The point is his attitude when he was asked to give some fingerprints. The point is his attitude when he was asked to take a polygraph test. That's the point. That's the point.

First, we note that Defendant has waived this issue by failing to object on this basis at trial. See Tenn. R. App. P. 36(a); State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). On appeal, Defendant also concedes that he has waived this issue by failing to raise it in his motion for new trial. Tenn. R. App. P. 3(e). However, this Court may, in its discretion, consider an issue which has been waived upon a finding of "plain error." Under the "plain error" doctrine, "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised

-12-

in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). In determining whether an error constitutes "plain error," this Court has set forth the following factors for consideration:

a) the record must clearly establish what occurred in the trial court;

b) a clear and unequivocal rule of law must have been breached;

c) a substantial right of the accused must have been adversely affected;

d) the accused did not waive the issue for tactical reasons; and

e) consideration of the error is 'necessary to do substantial justice.'

Adkisson, 899 S.W.2d at 634-35.

This test was formally adopted by our Supreme Court in State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000), which emphasized that all five factors must be established before plain error may be recognized. Id. The Court also stated that complete consideration of all the factors is unnecessary when it is clear from the record that at least one of the factors cannot be established. Id. Additionally, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

We must determine whether the State's comments constituted prosecutorial misconduct. In reviewing a claim of prosecutorial misconduct in closing argument we are guided by such factors as the intent of the prosecutor, the facts and circumstances of the case, the strength or weakness of the evidence, and the curative measures, if any, undertaken by the trial court in response to the prosecutor's conduct. See State v. Philpott, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). Prosecutorial misconduct does not amount to reversible error absent a showing that the improper conduct could have affected the verdict to the prejudice of the defendant. See Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). For the reasons stated hereafter, we find no evidence of "plain error."

Initially, Defendant claims that the State's questions and comments on his delay in providing a palm print sample to police violated his right against self-incrimination. He contends that "his right to silence would have allowed him to refuse to give his palm prints." He further contends that the State erred, during closing argument, by inferring that he refused to give his palm prints to police "without the threat of a court order."

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." Article I, § 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Although we may extend greater protection under our

State Constitution, our Supreme Court has traditionally interpreted article I, § 9 to be no broader than the Fifth Amendment. See State v. Frasier, 914 S.W.2d 467, 473 (Tenn. 1996). The privilege against self-incrimination is limited to those instances in which the state attempts to compel an individual to provide evidence of a testimonial or communicative nature. See id. It is not violated when the accused is compelled to provide non-testimonial real or physical evidence such as a hair, blood or fingerprint sample. See State v. Harris, 839 S.W.2d 54 (Tenn. 1992); Powell v. State, 489 S.W.2d 538, 540 (Tenn. Crim. App. 1972). Because a palm print sample is non-testimonial in nature, Defendant's constitutional right against self-incrimination was not implicated.

Defendant also contends that the State erred by questioning and commenting on Defendant's failure to submit to a polygraph test. Specifically, he claims that the State's comments, during closing argument, on Defendant's failure to submit to a polygraph examination created an adverse inference of guilt.

In Tennessee, it has long been established that the results of a polygraph examination are not admissible as evidence in a criminal prosecution. See Irick v. State, 973 S.W.2d 643, 652-53 (Tenn. Crim. App. 1998); State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App. 1995); State v. Adkins, 710 S.W.2d 525, 529 (Tenn. Crim. App. 1985). The appellate courts of this state have consistently held that the results of such tests are "inherently unreliable." Adkins, 710 S.W.2d at 529; State v. Land, 681 S.W.2d 589, 592 (Tenn. Crim. App. 1984). The fact that an accused either offered to take, took, or refused to take a polygraph examination cannot be admitted into evidence. See Adkins, 710 S.W.2d at 529.

We in no way condone a question or argument by a prosecuting attorney relating to a defendant's refusal to take a polygraph test. However, we note it was Defendant who, on direct examination, volunteered that he refused the "lie detector test." There was no request that a curative instruction be given, counsel apparently believing it would be best not to draw attention to it. Although we believe the prosecuting attorney should not have asked about, or commented on, the refusal to take the polygraph test so as to capitalize upon Defendant's unsolicited statement, the Defendant has suffered no prejudice. Therefore, we find no evidence that the State's question or comments rose to the level of "plain error" as they did not adversely affect "the substantial rights of the accused." Tenn. R. Crim. P. 52(b); Adkisson, 899 S.W.2d at 634-35. Defendant is not entitled to a relief on this issue.

II.      Sufficiency of the Evidence

In his next issue, Defendant argues that the evidence was insufficient to sustain his conviction of aggravated robbery of Frances Piper. Specifically, Defendant contends that there was no evidence that violence was used against Mrs. Piper, that she was put in fear, or that the robbery was accomplished by the use of a deadly weapon. We disagree.

The burden rests with Defendant to prove that the evidence was insufficient to support the verdict returned by the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We

must review the evidence in the light most favorable to the prosecution to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A guilty verdict in criminal actions shall be set aside on appeal only if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e).

The State, on appeal, is entitled to the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. See Keough, 18 S.W.2d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); State v. Herrod, 754 S.W.2d 627, 632 (Tenn. Crim. App. 1988)). Questions concerning witnesses' credibility, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact; the evidence will not be reweighed or reevaluated. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998).

Aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear, and accomplished with a deadly weapon, or by display of any article used or fashioned to lead the alleged victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. §§ 39-13-401(a), 402(a) (1997). In State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000)), our Supreme Court defined violence as "physical force unlawfully exercised so as to injure, damage or abuse." Id. at 217. In Fitz, the defendant shoved the victim, a convenience store clerk, with both of his hands in an aggressive manner. As a result, the victim was knocked backward into a cigarette display. The Supreme Court held that this conduct met the definition of "violence."

In the case *sub judice*, Mrs. Martin, the co-defendant, testified that Barry Braden held Mr. Piper at gunpoint while she and Kent Braden, armed with a .32 pistol, entered Mrs. Piper's bedroom, held the gun to Mrs. Piper's head, and stole her money and jewelry. They then forced her into the bedroom closet. We conclude that this conduct meets the definition of "physical force unlawfully exercised so as to injure, damage or abuse." Id. The indictment alleges that robbery was accompanied by violence or putting the victim in fear. In addition, Mr. Piper testified that immediately after the robbery, his wife was "numb" and appeared "scared to death." We find that the elements of violence and fear were proven sufficiently to sustain the conviction. Likewise, we find that there was sufficient evidence that the robbery was accomplished by the use of a deadly weapon. Defendant is not entitled to relief on this issue.

III.     Extraneous Statement

Defendant argues that the trial court erred by admitting Mr. Piper's extraneous statement, at the conclusion of redirect that, "I know one thing, [t]his thing [robbery] cost me my wife." Defendant contends that the statement was highly prejudicial because it suggested that Mrs. Piper's Alzheimer's was a result of the robbery. He also claims that this statement was inadmissible because it was not supported by competent medical evidence.

Defendant has waived this issue on appeal by failing to support his argument with authority. Tenn. Ct. Crim. App. R. 10(b). In addition, defense counsel failed to raise an objection during trial. Failure to object or take whatever action is reasonably available to prevent or nullify the harmful effect or error constitutes waiver of the issue on appeal. Tenn. R. App. P. 36(a). In any event, Defendant has failed to show that he was prejudiced by this statement. Defendant is not entitled to relief on this issue.

IV.  Consecutive Sentencing

Next, Defendant challenges the trial court's imposition of consecutive sentencing. Non-mandatory consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115. The trial court has discretion to order consecutive sentencing if a defendant is convicted of more than one criminal offense and if it finds, by a preponderance of the evidence, that one or more of the required statutory criteria exist. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments (1997); State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). These criteria include a finding by the court that the defendant is a "dangerous offender." Id. at § 40-35-115 (b)(4). A dangerous offender is defined as one "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. The dangerous offender classification, as has been previously observed, is subjective in nature. See State v. Howell, 34 S.W.3d 484, 515 (Tenn. Crim. App. 2000).

Defendant was convicted of six separate offenses of aggravated robbery, a Class B felony. See Tenn. Code Ann. § 39-13-402(b). The trial court imposed five consecutive ten-year sentences upon a finding that Defendant was a "dangerous offender with little regard for human life and no hesitation about committing a crime in which the risk to human life was high." Tenn. Code Ann. 40-35-115(b) (4). Defendant does not contest the trial court's finding that he is a dangerous offender. Instead, he argues that because consecutive sentencing is non-mandatory, the trial court should have imposed two consecutive ten-year sentences because the six offenses were committed during two criminal episodes on October 11, 1996 and October 16, 1996.

After a review of the record, we find that it is clear that the trial court acted within its authority and discretion by imposing consecutive sentences upon a finding that Defendant was a "dangerous offender." However, mere classification of Defendant as a "dangerous offender" is not sufficient, in and of itself, to sustain consecutive sentences. When the "dangerous offender" factor is used, the trial court is required to determine that consecutive sentences (1) are reasonably related

to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. See State v. Wilkerson, 905 S.w.2d 933, 939 (Tenn. 1995). In ordering consecutive sentences the trial court stated,

> [i]n order to follow the Wilkerson decision and look at what the effect of the whole sentence is, I'm going to run also, the sentence of Donald Piper consecutively, also, but run the sentence of Roger Piper concurrently . . . I think that is the purpose of the laws for consecutive sentences is to deter this from ever happening again.

Although the transcript does not reveal that the trial court made express findings that the Wilkerson test was satisfied, we find that it was. The record reveals that Defendant, who was nineteen at the time of these offenses, embarked on a violent crime spree where he robbed and terrorized numerous victims. On October 11, 1996, Defendant and his two co-defendants robbed Mr. Piper, an elderly gentleman, while he was sitting in his backyard. They then forcibly entered Mr. Piper's home and forced Mr. Piper to lie on the floor. Defendant, armed with a .32, held Mr. Piper at gunpoint while his accomplices robbed other members of the Piper household including Mr. Piper's son, grandson, and elderly wife. Testimony revealed that during each robbery, the assailants held a gun to each victim's head, demanded money, and then forced each victim into a closet. The items stolen from the Pipers included cash totaling less than $100.00, jewelry, an antique shotgun, and various household items. Five days later, Defendant, and the same accomplices, robbed a young couple at gunpoint. When questioned separately, the young couple both identified Defendant, on two separate occasions, as the person who robbed them. Ms. Martin, one of the co-defendants, testified that in each robbery, they were just "hanging out" looking for someone to rob. Although Defendant had no prior adult criminal record, we agree with the trial court's finding that these robberies were offenses where Defendant showed a complete disregard for human life. This is shown by testimony that in each robbery the multiple victims were chosen at random and the two incidents occurred only five days apart. Furthermore, in the Piper robberies, the Defendant held John Piper at gunpoint while his accomplices meticulously went throughout the home during the early morning hours robbing each person they encountered. We find that an aggregate fifty-year sentence bears a reasonable relationship to the severity of the offenses, is necessary to protect the public from further criminal acts by Defendant, and is congruent with general sentencing principles. See Wilkerson, 905 S.W.2d at 939. Consecutive sentences were appropriate under Tennessee Code Annotated section 40-35-115(b)(4) and Wilkerson. Defendant is not entitled to relief on this issue.

V.    Severance

Finally, Defendant contends the trial court erred by failing to severe the offenses at trial. Defendant argues that the trial court should have severed the offenses because the facts of each offense were so similar that "the jury was left with the impression that the defendant was guilty of one (1) offense because of its similarity in nature to the other offense." We disagree.

When a defendant is charged with multiple offenses, these offenses may be consolidated for trial based on Rule 8 of the Tennessee Rules of Criminal Procedure. Rule 8 of the Tennessee Rules of Criminal Procedure provides:

> **Rule 8. Joinder of Offenses and Defendants. –** (a) Mandatory Joinder of Offenses. – Two or more offenses shall be joined in the same indictment, presentment, or information with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictments(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

> (b) Permissive Joinder of Offenses. – Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.

Additionally, Rule 13 of the Tennessee Rules of Criminal Procedure states that "[t]he court may order consolidation of two or more indictments . . . if the offenses and all defendants could have been joined in a single indictment, presentment or information pursuant to Rule 8.

Although offenses are consolidated for trial, the defendant may move to sever those offenses under Rule 14 of the Tennessee Rules of Criminal Procedure. Rule 14(b)(2) states that offenses joined under Rule 8(a) may be severed before trial by motion of the State or defendant, or during trial, with the defendant's consent, if it is deemed necessary to promote or achieve a fair determination of the defendant's guilt or innocence of each offense. Tenn. R. Crim. P. 14(b)(2). On the other hand, when offenses are joined under Rule 8(b), a "defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1).

The record fails to contain any evidence that Defendant filed a motion to sever the offenses before or during the trial. "A defendant's motion for severance of offenses or defendants must be made before trial, except that a motion for severance may be made before or at the close of all evidence if based upon a ground not previously known. Severance is waived if the motion is not made at the appropriate time." Tenn. R. Crim. P. 12(b)(5), 14(a); See Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000).

## CONCLUSION

After reviewing the record as a whole, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE